**UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF NEW YORK**

– – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – –X

SPENCER LEE SCHNEIDER,                              Case No.  22-CV-7686

                     Plaintiff,

              v.                              <u>**VERIFIED COMPLAINT**</u>

OSG, LLC D/B/A ODYSSEY STUDY GROUP,
LORRAINE IMLAY and MINERVA TAYLOR,              JURY TRIAL DEMANDED
both individually and as fiduciaries of the
ESTATE OF SHARON GANS HORN, and
GREGORY KOCH,

                    Defendants.

– – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – –X

       SPENCER LEE SCHNEIDER, by and through his attorneys, Shihata & Geddes LLP, for

his Complaint against OSG, LLC D/B/A ODYSSEY STUDY GROUP, LORRAINE IMLAY

and MINERVA TAYLOR, both individually and as fiduciaries of the ESTATE OF SHARON

GANS HORN, and GREGORY KOCH (collectively, the "Defendants") alleges, on knowledge

as to his own actions, and otherwise upon information and belief, as follows:

## PRELIMINARY STATEMENT

       1.     As set forth more fully below, the plaintiff SPENCER LEE SCHNEIDER brings

this suit pursuant to the private cause of action created in connection with the Victims Of

Trafficking and Violence Protection Act of 2000, the Trafficking Victims Protection

Reauthorization Act of 2003 and the William Wilberforce Trafficking Victims Protection

Reauthorization Act of 2008 (collectively, the "TVPA and TVPRA") following a decades-long

scheme orchestrated by Sharon Gans Horn, now deceased, and other leaders of an organization

(the "Organization"), including the defendants MINERVA TAYLOR, LORRAINE IMLAY and

GREGORY KOCH, who collectively operated as a cult and used a scheme, pattern and plan

involving coercive and manipulative techniques that caused SCHNEIDER to perform thousands

of hours of unpaid labor and services by instilling in him a fear that if he did not perform such labor and services, he would endure serious harm, including psychological, financial, and reputational harm and other non-physical harm. Specifically, SCHNEIDER alleges that the Defendants violated the TVPA and TVPRA by committing, attempting to commit, and conspiring to commit, and/or by participating in a venture that committed, attempted to commit, and conspired to commit, forced labor against SCHNEIDER (and others) in violation of Chapter 77 of Title 18 of the United States Code.

2.      The plaintiff SPENCER LEE SCHNEIDER seeks compensatory and punitive damages against the Defendants under 18 U.S.C. § 1595(a), as well as his reasonable attorneys' fees, for the injuries inflicted upon him by the Defendants, directly and through their venture, in violation of 18 U.S.C. §§ 1589, 1590 and 2.

## JURISDICTION

3.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, in that this is a civil action arising under 18 U.S.C. § 1595(a).

## VENUE

4.      Venue is proper in this district under 28 U.S.C. § 1391(b)(1), in that the defendant LORRAINE IMLAY resides in this district and all of the Defendants reside in the State of New York.

## PARTIES

5.      The plaintiff SPENCER LEE SCHNEIDER is an individual who resides in New York, New York. For approximately 23 years, in or about and between 1989 and 2013,

SCHNEIDER was a "student" under the direction of leaders of the Organization (which is described further below), including Sharon Gans Horn and the Defendants.

6.      Upon information and belief, the defendant LORRAINE IMLAY is an individual who resides in Queens, New York. In or about and between the early 1980s and the present, IMLAY was, as further described below, a member of the Inner Circle of the Organization, which terms are defined below. In 2021, upon the death of Sharon Gans Horn, IMLAY was appointed as a co-executor of the estate of Sharon Gans Horn and was bequeathed a membership interest in OSG, LLC.

7.      Upon information and belief, the defendant MINERVA TAYLOR is an individual who resides in New York, New York. In or about and between the early 1980s and the present, TAYLOR was, as further described below, a member of the Inner Circle of the Organization, which terms are defined below. In 2021, upon the death of Sharon Gans Horn, TAYLOR was appointed as a co-executor of the estate of Sharon Gans Horn and was bequeathed a membership interest in OSG, LLC.

8.      Upon information and belief, the defendant GREGORY KOCH is an individual who resides in New York, New York. In or about and between the early 1980s and the present, KOCH was, as further described below, a member of the Inner Circle of the Organization, which terms are defined below, and was bequeathed a membership interest in OSG, LLC.

9.      Upon information and belief, the defendant OSG, LLC is a limited liability company formed under the laws of New York and does business in New York, New York. Between 2001 — when OSG, LLC, was formed as a limited liability company — and until Sharon Gans Horn's death in 2021, Gans Horn controlled OSG, LLC, through which Gans Horn and others led and operated the Organization, which term is defined below. Upon information

and belief, at various times, the defendants LORRAINE IMLAY, MINERVA TAYLOR and GREGORY KOCH have owned portions of OSG, LLC, and they were bequeathed membership interests in OSG, LLC, upon the death of Gans Horn who, in her testamentary trust, expressed her "strong hope and desire" that the Defendants allow the "business to continue to operate successfully."

## FACTS

I.     Background

    A.     Relocation of Sharon Gans Horn & Defendants from San Francisco to New York

    10.     Upon information and belief, in the 1970s, Sharon Gans Horn, together with her husband, Alex Horn, operated an organization in San Francisco, California under the auspices of a theater company that engaged in deceptive and manipulative conduct. After allegations surfaced in the local San Francisco press in 1978 that their San Francisco organization was, in fact, a cult, which engaged in child abuse, sexual abuse, forced labor, and bilking of money, Gans Horn and Alex Horn abruptly left San Francisco and eventually relocated to New York in or about 1980.

    11.     Upon information and belief, the defendants LORRAINE IMLAY, MINERVA TAYLOR and GREGORY KOCH were each members of the above-referenced San Francisco cult and, when it stopped operating there, they followed Gans Horn and Alex Horn to New York in or about 1980 to continue its operations.

    B.     The Organization and the "School"

    12.     Upon information and belief, after their relocation to New York, Sharon Gans Horn, together with others, including the defendants LORRAINE IMLAY, MINERVA TAYLOR and GREGORY KOCH, started an organization (the "Organization"), which operated

in secret and purported to be an "esoteric school" (the "School") that promoted the teachings of George Gurdjieff and one of Gurdjieff's students, Peter Ouspensky, and purported to provide its "students" (the "Students") tools to enrich the Students' lives, to improve the Students' psychological  well-being and to achieve overall success.

13.    In or about and between 1980 and 2001, the Organization operated as an unincorporated business. Beginning in or about 2001, however, Sharon Gans Horn, and others, formed OSG, LLC, a New York State limited liability company, in order to continue the objects of the Organization. Upon its formation, the Organization continued to operate in the same manner as prior to its formation as a limited liability company. The term "Organization" as used herein, therefore, refers to both the limited liability company and its predecessor organization that operated in New York, as described in more detail below.

14.    Upon information and belief, OSG, LLC, was formed in order to evade taxes. Upon information and belief, prior to the formation of OSG, LLC, the Organization only accepted cash payments, but after its formation, the Organization began to accept a portion of payments in checks and only the cash payments were reported on OSG, LLC's tax returns.

15.    The Organization operated in several locations: New York, New York; Boston, Massachusetts; Condon, Montana; Pawling, New York; and Copenhagen, Denmark.

16.    Beginning with the inception of the Organization and until Sharon Gans Horn's death in 2021, Gans Horn served as the leader of the Organization and served as the head "teacher" at all locations, although she was primarily based in the New York location of the Organization.

17.    Sharon Gans Horn selected a handful of close lieutenants to serve as enforcers of the rules of the Organization, including the rules described below, and as "teachers" and leaders

of the Organization. Together, Gans Horn and the lieutenants she selected comprised the Organization's "Inner Circle." At all relevant times, the defendants LORRAINE IMLAY, MINERVA TAYLOR and GREGORY KOCH were – for decades – prominent members of the Inner Circle. All references hereinafter to the Inner Circle include the defendants LORRAINE IMLAY, MINERVA TAYLOR and GREGORY KOCH.

18.    The Inner Circle managed the day-to-day affairs of the Organization (including but not limited to collecting tuition and other fees, leading and teaching "classes" at the School ("Class") and enforcing the Organization's rules), and were the beneficiaries of the Organization's spoils.

19.    The primary purpose of the Organization and the Inner Circle was to make money. Specifically, the Organization and the Inner Circle recruited the Students to attend Class, engaged in manipulation and coercive tactics to retain Students and ultimately, benefitted financially through tuition payments, tithing and labor performed by the Students, as described in further detail below.

20.    Most of the members of the Inner Circle were also "teachers" at Class ("Teachers"). The defendants LORRAINE IMLAY and GREGORY KOCH served as Teachers. While MINERVA TAYLOR was a member of the Inner Circle, she only occasionally served as a Teacher.

21.    Most of the Students were educated professionals, including business owners, educators, lawyers, physicians, executives, and money managers.

22.    The defendant MINERVA TAYLOR owned and operated a Manhattan recruitment agency that employed certain of the Students. The defendant LORRAINE IMLAY

was a New York City Public School teacher and later, a retired school teacher. The defendant GREGORY KOCH was a construction manager of high-end real estate properties.

23.     At the direction of the Organization and the Inner Circle, the Students paid tuition and attended Class semi-weekly, as well as numerous other activities and "retreats." The defendants MINERVA TAYLOR and LORRAINE IMLAY were among the members of the Inner Circle who collected from the Students tuition and other fees imposed by the Organization.

24.     At the direction of the Organization and the Inner Circle, the Students performed labor and services without compensation, including but not limited to physical labor in Montana, New York, and Massachusetts; recruitment of new prospective students; elaborate preparation for events; attendance at Class semi-weekly; cooking, cleaning, and chauffer services. At all relevant times, the defendants LORRAINE IMLAY, MINERVA TAYLOR and GREGORY KOCH directed the Students to perform these and other labor and services without compensation.

25.     At the direction of the Organization and the Inner Circle, the Students were directed to tithe on a regular basis to Sharon Gans Horn.

26.     At all relevant times, at the School in New York, the Organization and the Inner Circle operated three Classes. That is, the School enrolled three groups of Students in three separate Classes (and therefore Class was held six times per week, with each Student attending twice per week). Upon information and belief, the number of Students in each Class varied over time and among Classes, but ranged from 35 to 60 Students per Class, and the combined number of Students at the School in New York ranged from 100 to 180 Students at any given time.

27.     The Organization and the Inner Circle stressed that in order for Students to gain the full psychological benefits of the School, the Students needed to make timely financial

payments to the Organization and the Inner Circle. Failure to make timely payments would lead to public reprimand and expulsion. At all relevant times, the Organization and the Inner Circle imposed various charges on each of the Students, including but not limited to:

(a)     Tuition for Class: anywhere from $300 to $400 per month (after the first month free);

(b)     Tuition for "acting class": $100 per month;

(c)     Tuition for annual "retreat": $1200 plus the cost of airfare;

(d)     $100 annually for Sharon Gans Horn's "retirement fund";

(e)     $10 weekly toward an "orphanage fund";

(f)     $50 monthly "maintenance fee," which went towards rent, utilities, and other monthly expenses of the facilities where Class was held;

(g)     More than $1,000 annually for property taxes and upkeep on a ranch in Montana (the "Montana Ranch") of which Gans Horn was the beneficial owner and sole resident;

(h)     More than $200 annually for Christmas parties and birthday parties;

(i)     $200 annually for Christmas and birthday gifts for Gans Horn and members of the Inner Circle; and

(j)     approximately $200 per weekend for attending "country retreats" at the Pawling, New York compound.

28.     Upon information and belief, applying a conservative estimate of an average of 80 Students over 20 years, the Organization received almost $14 million in revenue at the School in New York alone.

29.    The Organization and the Inner Circle told the Students that there were three lines of "work" within the Organization. According to the Organization and the Inner Circle:

(a)    The "First Line of Work" consisted of the various exercises that were designed to "awaken" the Student and ultimately lead to their "evolution," i.e., achieve a higher success in life. The First Line of Work was purportedly 100 percent for the benefit of the Student personally.

(b)    The "Second Line of Work" consisted of the instances when the Student helped his neighbor—in this case other Students—to work on themselves, while also using those instances as a reminder to the Student to remember whatever the Student said to the other Students. The Second Line of Work was purportedly 50 percent for the benefit of the other Students and 50 percent for benefit of the Student personally.

(c)    The "Third Line of Work" consisted of instances where the Student gave 100 percent for the benefit of the Organization—to keep it functioning and maintained in all respects.

30.    Students were taught that the Third Line of Work was the most important line of work and a condition to remain a Student at the School. The defendants LORRAINE IMLAY, MINERVA TAYLOR and GREGORY KOCH were among the members of the Inner Circle who promoted to the Students the importance of the Third Line of Work and directed Students to carry out the Third Line of Work.

31.    To achieve its objectives, the Organization and the Inner Circle promulgated numerous rules (the "Rules") that they required the Students to follow. The Rules included Rules #1 to #10, as described below.

32.    Rule #1 – Secrecy.  The Organization and the Inner Circle repeatedly told the Students that the cardinal rule of the Organization was that the Organization must remain invisible. To justify this rule, they claimed that invisibility was necessary to "protect" the "knowledge" the Students learned from the Organization. The Organization repeatedly directed the Students that they could not discuss the existence of the Organization – or its ideas or "knowledge" – outside of Class with anyone. The Students were not permitted to disclose to anyone what happened during Class. The leaders of the Organization and the Inner Circle instructed the Students to say nothing about their nights out involving the Organization to their spouses except that it was "private" and to respect that. If the spouse persisted, they were to say, "it is none of your business." Under the guise of this rule, the Inner Circle never discussed with the Students their personal histories or the blemished history of the Organization. Indeed, the Organization and the Inner Circle deliberately suppressed this information.

33.    Rule #2 – Semi-weekly classes. The Organization and the Inner Circle instructed the Students that they were to attend Class twice a week, even if a Student was ill. Class began at 7:00 p.m. and lasted until midnight or later.

34.    Rule #3 – Timeliness. The Organization and the Inner Circle instructed the Students that they were to arrive ten minutes early to Class.

35.    Rule #4 – No bathrooms. The Organization and the Inner Circle strongly discouraged the Students from taking bathroom breaks during Class because, according to them, "nothing is ever repeated in Class and once it's missed it's gone forever; it's a 'law' that people miss the most important thing they need to hear when they were not present in Class."

36.    Rule #5 – No fraternization. The Organization and the Inner Circle instructed the Students that they could not fraternize with other Students outside of Class or even exchange

phone numbers without their express permission. After Class, the Students were told to go their separate ways—to not share cabs or take the train together. The Students were further instructed that if they coincidentally bumped into one other on the street or subway or anywhere, they should just look the other way and carry on.

37.    Rule #6 – Hour of silence. The Organization and the Inner Circle instructed the Students that they should observe an hour of silence immediately after Class ended.

38.    Rule #7 – No therapists. The Organization and the Inner Circle instructed the Students that they were not to meet with therapists.

39.    Rule #8 – Ostracization of former Students. The Organization and the Inner Circle instructed the Students that they were not to contact any individuals who stopped participating in the Organization. If an individual who stopped participating in the Organization were to contact any of the Students in the Organization, the Students were directed not to engage and to let a member of the Inner Circle know of the attempted contact. After Students voluntarily or involuntarily left School, the Organization and the Inner Circle would publicly denigrate and criticize those Students and label those Students as "dangerous."

40.    Rule #9 – Obedience. The Organization and the Inner Circle told the Students that they should "trust in their Teachers," be completely forthright with the Teachers and reject any contrary advice from individuals outside of the Organization, and regularly offered "suggestions" to the Students. Refusal to follow any "suggestions" from the Teachers – and particularly from Sharon Gans Horn, and including from the defendants LORRAINE IMLAY, MINERVA TAYLOR and GREGORY KOCH– typically would result in the Organization publicly labeling the Student as "willful" or "spiteful" and the Student's conduct as evidence of deep personal negativity and hostility to the purported good intentions of the Organization.

41.     <u>Rule #10 – Control over personal decisions</u>. The Organization and the Inner Circle made clear to the Students that they should cede control over their personal decisions to the Organization and the Inner Circle. Sharon Gans Horn, together with the Organization and the rest of the Inner Circle, commanded Students who to date and have sex with, when and who to marry, when to have children, when not to have children, when to have children and give them up for adoption, when to pay and how much to pay in child support, when to shun their children, when to divorce, whether to have abortions, and whether to have a vasectomy or tubal ligation. To maintain control and ensure that the Students adhered to her whims, Gans Horn engaged in unpredictable and outrageous conduct, and in an instant, would deliberately upend the lives of her Students by making a demand of the Students regarding their personal lives.

42.     Through promulgating and enforcing Rules #1 to #10, the Organization and the Inner Circle attempted to maintain, and maintained, absolute control over the personal and professional lives of many of the Students.

C.     <u>Recruitment Methods</u>

43.     Upon information and belief, Sharon Gans Horn and the defendants LORRAINE IMLAY and MINERVA TAYLOR oversaw the creation and implementation of the Organization's recruitment practices.

44.     The Organization and members of the Inner Circle, including Sharon Gans Horn and the defendants MINERVA TAYLOR and LORRAINE IMLAY, determined that the ideal Student needed to be unhappy or dissatisfied about something important in his or her life, to be searching for answers, meaning and help, to be affluent, to be young and healthy, to be open-minded and to have no connections to law enforcement or the media.

45.     The Organization and members the Inner Circle, including Sharon Gans Horn and the defendants LORRAINE IMLAY and MINERVA TAYLOR, developed a sophisticated and intricate method that was designed to simultaneously lure and vet candidates for membership in the Organization while also keeping the process entirely secret so that only the "best" candidates ever found out about the existence of the Organization.

46.     The Organization and members of the Inner Circle designed the recruitment process to include the following seven steps: (i) identifying prospective candidates who matched the Organization's requirements, including that the candidates were particularly susceptible to the manipulative and coercive techniques used by the Organization, (ii) the initial engagement with the prospective candidates, (iii) multiple meetings with the prospective candidates where the candidates were further vetted and slowly acclimated to the prospect of participating in an "esoteric school," (iv) introducing prospective candidates to the Organization and members of the Inner Circle, (vi) telling the prospective candidates about the "esoteric school," and (vii) finally, bringing the prospective candidates to the School to attend a Class.

D.      Financial Benefits and Other Things of Value to the Inner Circle

47.     Upon information and belief, Sharon Gans Horn and the defendants LORRAINE IMLAY, MINERVA TAYLOR and GREGORY KOCH received one or more things of value as a result of their leadership and participation in the Organization.

48.     As a result of her leadership and participation in the Organization, Sharon Gans Horn benefitted financially and benefitted by receiving one or more things of value including but not limited to millions of dollars, free labor provided by the Students on real properties over which Gans Horn was the beneficial owner, real property purchased by the Students, meals prepared by the Students, personal assistant and cleaning services provided by the Students,

accounting services provided by the Students, chauffer services provided by the Students, the authority to make demands of the Students at all times during and outside of Class, services provided by Students during Class and retreats, and an otherwise privileged status within the Organization.

49.    Upon information and belief, although many of the Teachers at the School began as Students and had employment independent of the Organization, Sharon Gans Horn's primary source of income was from her leadership of the Organization.

50.    Upon information and belief, at the time of her death, Sharon Gans Horn resided in an $8.5 million condominium located in The Plaza Hotel in Manhattan, New York, which was purchased by "Unit 405 Plaza LLC," a nominal entity created by members of the Organization, including the defendant MINERVA TAYLOR.

51.    As a result of their leadership and participation in the Organization and membership in the Inner Circle, the defendants LORRAINE IMLAY and GREGORY KOCH benefitted financially and benefitted by receiving one or more things of value including but not limited to a salary for their roles as Teachers and enforcers within the School, meals prepared by the Students, the authority to make demands of the Students, meals and drinks served to them by Students during Class, massages provided by the Students during Class, and an otherwise privileged status within the Organization.

52.    As a result of her leadership and participation in the Organization and membership in the Inner Circle, the defendant MINERVA TAYLOR benefitted financially and benefitted by receiving one or more things of value including but not limited to the ability to hire Students as employees of her business, the use of vacation homes in Mexico and Bridgehampton,

New York that were beneficially owned by Sharon Gans Horn, the authority to make demands of Students, and an otherwise privileged status within the Organization.

53.     As a result of their leadership and participation in the Organization and membership in the Inner Circle, the defendants LORRAINE IMLAY and MINERVA TAYLOR benefitted financially and benefitted by receiving one or more things of value including but not limited to labor and services to improve their personal vacation residences, which labor and services were provided by the Students and without compensation.

54.     As a result of their leadership and participation in the Organization and membership in the Inner Circle, the defendants MINERVA TAYLOR and GREGORY KOCH benefitted by receiving one or more things of value including but not limited to opportunities for sexual and romantic relationships with Students, Teachers and other members of the Inner Circle sanctioned by Sharon Gans Horn. For example, at different times, TAYLOR was married to KOCH and another member of the Inner Circle; TAYLOR also had sexual relationships with another member of the Inner Circle and a Student. At different times, KOCH had a sexual relationship with a Student and one member of the Inner Circle.

II.     The Recruitment and Indoctrination of SPENCER LEE SCHNEIDER

55.     In or about 1989, an individual, Individual #1, together with others, recruited the plaintiff SPENCER LEE SCHNEIDER, who was then 29 years old and a junior lawyer, to attend Class at the School, which Individual #1 then described to SCHNEIDER as an esoteric school and a place designed to allow individuals to learn, evolve and ultimately improve themselves.

56.     When SCHNEIDER was recruited, he was mourning the loss of his father who had died suddenly four years earlier and contending with a growing sense of loneliness that

stemmed from his watching on as many of his friends moved away from New York City to start families while he was still single.

57.    To entice SCHNEIDER to attend, Individual #1 told SCHNEIDER that he could attend Class for the first month for free, but after the first month, he would have to pay tuition of $300 per month.

58.    In conversations with Individual #1 and during subsequent Classes at the School, SCHNEIDER was told that the Students learned from the works of a "philosopher" named George Gurdjieff and one of Gurdjieff's students, Peter Ouspensky. SCHNEIDER, who was himself a student of philosophy and searching for meaning and fulfillment in his life, agreed to give it a try. Individual #1 failed to disclose to SCHNEIDER that the Organization and Inner Circle that operated the School engaged in wide-scale deception and manipulation; that the Organization and Inner Circle that operated the School required Students to pay hundreds of thousands of dollars in tuition and fees; and the Organization and Inner Circle that operated the School coerced Students to provide extensive labor (almost of which was for the benefit of the Organization and the Inner Circle).

59.    Upon information and belief, Individual #1 recruited SCHNEIDER at the direction of the Organization and under the close supervision of the defendant MINERVA TAYLOR. (Several years later, TAYLOR told SCHNEIDER that she oversaw the Organization's recruitment of SCHNEIDER.)

60.    When SCHNEIDER arrived at his first Class at the School, the defendant MINERVA TAYLOR greeted him. She told him, in part and in substance, "I'm so happy for you that you are here, Spencer. I hope this is a rich and wonderful experience for you and I think it will be," and then suggested to him that he might meet his "soulmate" at the School.

61.    At an orientation for new Students and in subsequent Classes that SCHNEIDER attended, a Teacher of the Organization instructed the new Students, including SCHNEIDER, about the Rules, including Rules #1 to #10 described above.

62.    The first Class that SCHNEIDER attended was unappealing to SCHNEIDER and he left early. As he was on his way out, a leader of the Organization called him out by name in front of the rest of the Students, but allowed him to leave.

63.    The day after SCHNEIDER's first Class, another individual ("Individual #2") called SCHNEIDER and introduced himself as SCHNEIDER's "sustainer." The sustainer assigned to SCHNEIDER explained to SCHNEIDER that a sustainer was an older Student who SCHNEIDER would be able to talk with outside Class, one on one, about anything discussed in Class, the readings the Students would be doing, and anything else.

64.    Upon information and belief, the assignment of a sustainer was a component of the recruitment process used by the Organization, and all new Students were assigned "sustainers" when they first started to attend Classes led by the Organization. Upon information and belief, SCHNEIDER's sustainer reported back to the leaders of the Organization and members of the Inner Circle, including Sharon Gans Horn, about what SCHNEIDER had told the sustainer about himself and the Organization and members of the Inner Circle deceptively used that information to retain SCHNEIDER as a Student.

65.    SCHNEIDER attended a second Class at the School and continued to attend semi-weekly Classes for the next year. During those Classes, the Organization and the Inner Circle drilled into SCHNEIDER and the other Students the teachings of the Organization, which the Organization called "the Work."

66.     Within a few weeks of starting as a Student, SCHNEIDER lost his job at the law firm where he had been employed and decided to start a law firm as a solo practitioner. SCHNEIDER told the Organization and members of the Inner Circle, including the defendant MINERVA TAYLOR, about his decision to open a law firm, and they supported his decision. When SCHNEIDER's law firm became successful, the Organization and its Inner Circle told SCHNEIDER that the firm was successful because of his participation in the School and that without the School, it would not be successful.

67.     In or about 1990, approximately one year after SCHNEIDER began to attend Classes, Sharon Gans Horn started to make appearances at Classes. At the first Class in which Gans Horn spoke, she discussed seven "levels of man" and stated that she was "very close" to the seventh level, which she described as being immortal and equated to "Christ, Mohammed, Moses and the Buddha," and that she hoped to reach the seventh level soon. In that same Class, Gans Horn told the Students that sex affected their ability to succeed and directed the Students to "use your sex" to promote the School and the Students' "evolution," i.e., achievement of higher success in life.

68.     Thereafter, and for the next 23 years that SCHNEIDER was a Student at the School, Sharon Gans Horn sporadically attended and taught Classes at the School.

69.     After SCHNEIDER spent approximately one year in the Organization, leaders of the Organization invited SCHNEIDER and a small subset of the Students to participate in an "acting" class (the "Acting Students"). SCHNEIDER agreed. (Like Classes, tuition was charged for this acting class.)

70.     A few months after SCHNEIDER and the other Acting Students started participating in the acting class, one member of the Inner Circle instructed the Acting Students

18

that they would now be permitted to fraternize with other students of the Organization – but only with the Acting Students (not all of the Students).

71.     Thereafter, SCHNEIDER, like other Acting Students, started to regularly fraternize with other Acting Students and quickly SCHNEIDER's closest friends were the Acting Students.

72.     SCHNEIDER also developed very close relationships with other Students in the Organization although he did not see them outside of Class and other events sponsored by the School.

73.     Each year, the Organization held an annual Christmas Class. The annual Christmas Class was a black-tie affair and required extensive labor and services to make it happen, as described in further detail below. The Students were told by the Organization and the Inner Circle that the Christmas Class was an event to fete Sharon Gans Horn.

74.     Members of the Inner Circle, including the defendants LORRAINE IMLAY, MINERVA TAYLOR and GREGORY KOCH, oversaw the Students' preparations for the annual Christmas Class, including by requiring Students to devote hundreds of hours of their time in the weeks and months before the Christmas Class preparing for the Christmas Class.

75.     Like other events of the Organization, the Organization and the Inner Circle instructed the Students that they could not tell individuals outside of the Organization what they were doing during those periods of time. The Organization and the Inner Circle also instructed those who had families out of town that they not to go away until at least Christmas Eve day. Delayed holiday travel and the time spent on the Christmas Class preparations further created conflict between the Students and their friends and family members outside of the Organization, and thereby further isolated the Students.

76.     During Class and other events orchestrated by the Organization, the Organization and the Inner Circle used a classic combination of coercive and manipulative tactics to isolate SCHNEIDER from his family, friends and business colleagues, indoctrinate SCHNEIDER in the protocols of the Organization, and ultimately to wholly enmesh SCHNEIDER's livelihood with that of the Organization.

77.     By and through the design of the Organization and the Inner Circle, SCHNEIDER distanced himself from his immediate family and lost substantive contact with close friends from outside the Organization.

78.     By and through the design of the Organization and the Inner Circle, soon after launching a business – a solo law practice – with the Organization's approval, SCHNEIDER started to believe that the business's success was solely on account of his participation in the Organization.

79.     By and through the design of the Organization and the Inner Circle, SCHNEIDER's family and previously-close friends were replaced by relationships with other Students of the Organization.

80.     By and through the design of the Organization and the Inner Circle, and only with the express approval of Sharon Gans Horn, SCHNEIDER married and had a child with another Student of the Organization, hereinafter, "Student #1."

81.     Upon information and belief, the Organization orchestrated SCHNEIDER's marriage to Student #1 in order to further isolate SCHNEIDER from his family and friends outside the Organization and to entrench him in the Organization.

82.     By and through the design of the Organization and the Inner Circle, and only with the express approval of Sharon Gans Horn, beginning in or about 2000, SCHNEIDER's primary business client was a Student of the Organization, hereinafter "Student #2."

83.     The Organization and the Inner Circle used a panoply of tools to methodically gain and maintain control over the Students, including SCHNEIDER, which included secrecy, isolation, indoctrination, subjugation, shame and humiliation, emotional abuse and degradation, gaslighting, negative information and economic abuse.  By using these tools, in isolation and collectively, the Organization and the Inner Circle were able to first gain, and then maintain, power and control over the Students, including SCHNEIDER. Once the Organization and the Inner Circle gained that power, they exploited it.

84.     Upon information and belief, experts on the use of coercive and manipulative techniques have explained that leaders of cults and other secret organizations tend to engage in a pattern of coercive and manipulative conduct over a long period of time that is designed to slowly erode an individual's psychological well-being. Upon information and belief, such experts have identified the tools described in paragraphs 85 to 95 as tools used to obtain and maintain control over individuals.

85.     Secrecy. Secrecy allows an abuser to perpetrate – and continue to perpetrate – physical and psychological abuse because there is a diminished risk that the abuse will be exposed.

86.     Isolation. Isolation allows an abuser to remove one's social support system that would buffer the effects of psychological distress. Without social support, it is increasingly difficult to extricate oneself from the abusive relationship or situation.

21

87.    <u>Indoctrination</u>. Indoctrination occurs where an abuser instills a new belief system in an individual and eliminates individual autonomy and decision-making.

88.    <u>Subjugation</u>. Subjugation is a method whereby an individual is treated as a servant and told to do what the abuser says without regard to the individual's own thoughts, wishes or desires.

89.    <u>Shame and humiliation</u>. Shame and humiliation serve to disincentivize an individual from speaking about the abuse to others and therefore serves to further perpetuate the abuse.

90.    <u>Emotional abuse and degradation</u>. Emotional abuse functions to belittle an individual's sense of self and sense of self-worth.

91.    <u>Sleep deprivation</u>. Sleep deprivation is used to hinder an individual's ability to make rational decisions.

92.    <u>Intolerance for any dissent</u>. A demonstration of intolerance for dissent reduces the likelihood that an individual will exercise individual thought.

93.    <u>Gaslighting</u>. Gaslighting is the act or practice of grossly misleading another person, especially for one's own advantage. When an individual repeatedly tells another person that the person's perception of reality is mistaken, that person may start to feel destabilized.

94.    <u>Negative information or collateral</u>. Negative information or collateral serves as an additional deterrent for an individual to report abuse because of the fear that the negative information or collateral could be further disclosed.

95.    <u>Economic abuse</u>. Economic abuse occurs when the abuser is in control of all the financial decisions and the individual is financially unable to extricate themselves from an abusive relationship or situation.

96.     In or about and between 1989 and January 2013, the Organization and the Inner
Circle used virtually all of the tactics described in paragraphs 85 to 95 to obtain and maintain
control over the Students, including SCHNEIDER. Some examples of those tactics are set forth
below.

SLEEP DEPRIVATION

97.     The Organization and the Inner Circle required the Students, including
SCHNEIDER, to spend long hours at Class and other events, leading them to experience severe
sleep deprivation and thereby causing the Students to be less discerning as to the methods used
by the Organization to control them.  (The Students' participation in Class and other
Organization events was in addition to the Students' employment at their regular jobs, which
employment often entailed long working hours.)

98.     The Organization and the Inner Circle told the Students that sleep was harmful to
their "evolution," i.e., their ability to achieve a higher success in life, and that they needed no
more than a few hours of sleep each night.

EMOTIONAL ABUSE AND HUMILIATION

99.     The Organization and the Inner Circle often publicly, and sometimes brutally,
reprimanded the Students for perceived transgressions in a manner that often left Students
feeling shame and humiliation. These reprimands typically happened in front of the other
Students and the shame and humiliation were amplified because the other Students, having been
conditioned to do so, often joined in on the reprimands.

100.    One such incident occurred on an occasion in December 2012, where Students
from multiple Classes gathered together at the direction of the Organization. The incident began
after Sharon Gans Horn publicly congratulated a woman, hereinafter "Student #3," in a married

couple for recently becoming pregnant. As all of the other Students were echoing their congratulations to Student #3, another Student, hereinafter "Student #4," congratulated a third Student, hereinafter "Student #5," who Student #4 knew to be Student #3's husband and the father of the new baby. Gans Horn looked at Student #4 coolly and told her that they would only be speaking of Student #3 (and not Student #5) that night. Through the prior actions of the Organization and the Inner Circle, SCHNEIDER understood that Gans Horn was upset because many of the Students did not know that Student #3 was married to Student #5 (as they attended Class on different nights), and Gans Horn believed that it was her sole prerogative to share this information.

101.    At a subsequent Class held thereafter, Sharon Gans Horn stared at Student #4 and roared at the top of her lungs, in substance, "You've got a big mouth. How dare you open your trap. You are asleep. Asleep! It is killing me, and you are trying to kill School too." When Student #4 began to sob uncontrollably, several of the other members of the Inner Circle, including the defendants MINERVA TAYLOR and GREGORY KOCH, also publicly berated Student #4 for her transgression. None of the other Students even attempted to defend Student #4 for fear of the consequences and many joined in the public rebuking. When SCHNEIDER said nothing but seemingly expressed his disgust in his facial expression, Gans Horn reprimanded him for being "negative."

102.    On more than one occasion during Class, SCHNEIDER stated that he needed to leave Class before it ended due to early work meetings the following day or because he was tired or feeling ill. On these occasions, the defendants LORRAINE IMLAY, MINERVA TAYLOR and GREGORY KOCH, together with others, upbraided SCHNEIDER, publicly labeling him in

front of other Students, including his spouse (Student #1), as lazy, willful, insubordinate, rude, and other derogatory terms, and causing him severe humiliation and shame.

## GASLIGHTING

103.    The Organization and the Inner Circle engaged in gaslighting Students such that it became difficult for Students to differentiate reality from fiction.

104.    On one occasion, while the Organization was preparing for its annual Christmas Class, SCHNEIDER was slated to serve as the DJ. The defendant MINERVA TAYLOR asked SCHNEIDER to show her the song list for the event. When she saw the song, "Over the Rainbow," she turned to SCHNEIDER and said accusingly, in substance, "That song shouldn't have been included, Spencer. [Another leader] told you it was a silly, sentimental song." In fact, the other leader had said no such thing. Until then, TAYLOR had only spoken to SCHNEIDER with respect and kindness. When SCHNEIDER tried to explain his mistake, TAYLOR lost her composure and, in front of a roomful of others, loudly accused SCHNEIDER of lying. Confused, but fearful of the consequences of not giving in, SCHNEIDER relented and simply said, in substance, "You're right. I remember now. I must have been asleep." TAYLOR then turned and hugged him, congratulating him for "the breakthrough" in his now recognizing what a liar "Spencer Schneider" had been, using his first and last name to reference and distinguish SCHNEIDER's "false self" from his nameless "real self," which the Organization purportedly helped the Students to realize and embody.

## INDOCTRINATION

105.    The Organization and the Inner Circle repeatedly regurgitated the plethora of rules that the Students needed to follow in an effort to brainwash them and scolded them for even minor transgressions of the Organization's rules.

106.    On one night, when SCHNEIDER came late to Class due to a phone installation at his office, a Teacher of Class publicly confronted him about his lateness, leaving SCHNEIDER embarrassed and fumbling for an explanation. The leader shook his head and said, in substance, "No, that is life thinking. You were late because your valuation of School is still low, and you have a weak being." The Teacher continued, "If your valuation—your love of the Work—were what it should be, you would have been here on time. If you had a strong being, you would have found a way to make sure you were here on time and that your phone was installed at the same time." The Teacher's reprimand left SCHNEIDER feeling queasy, light-headed and utterly vulnerable. SCHNEIDER thanked the Teacher for his comments.

107.    On another occasion, a leader of the Organization showed up at an improvisation show in which SCHNEIDER was performing.  When SCHNEIDER and that leader crossed paths in the lobby of the theater, SCHNEIDER greeted the leader by name. The next time SCHNEIDER encountered that leader at Class, the leader escorted SCHNEIDER aside and scolded him for that transgression. The leader told SCHNEIDER that his conduct at the theater was "dangerous" for the Organization and detrimental to SCHNEIDER's evolution. Significantly, after this reprimand, SCHNEIDER grew very fearful that another transgression could cause him to be expelled from the Organization, a thought that petrified him given how the Organization had utterly consumed – and become – his life.

108.    On another occasion, the defendant LORRAINE IMLAY and another Teacher were leading Class with SCHNEIDER seated in the back row of the room wearing a baseball cap. Seeing SCHNEIDER in the back row alone, IMLAY interrupted Class and said in a harsh and commanding manner, "Spencer, why are you sitting back there wearing a hat? Come on up front." SCHNEIDER explained that he was under the weather and did not want to get anyone

else sick. The other Teacher remarked to IMLAY, "I sometimes wear a baseball cap when I'm sick," and directed SCHNEIDER, to "verify the Work," remove his cap and move to the front of room. SCHNEIDER, now under the influence of the Organization, complied.

COLLATERAL

109.    The Organization and the Inner Circle obtained sensitive and private information about the Students, disincentivizing the Students from leaving the Organization for fear that the information could be further disseminated.

110.    The defendants LORRAINE IMLAY, MINERVA TAYLOR and GREGORY KOCH acted as spies for the Organization by winning over the trust of Students, obtaining confidential information from Students and then disclosing those secrets to Sharon Gans Horn so that they could be used to enrich the Organization.

111.    At times, when a Student broke a rule, including by failing to adhere to one of Sharon Gans Horn's directives, Gans Horn disclosed personal and sensitive information, obtained by her through members of the Inner Circle, including the defendants LORRAINE IMLAY, MINERVA TAYLOR and GREGORY KOCH, about the Student to others.

112.    Sharon Gans Horn frequently, and without warning, openly discussed during Class Students' marital problems and intimate details about their sex lives, and encouraged adultery among Students. SCHNEIDER lived in fear that Gans Horn would publicly discuss intimate details about his and Student #1's sex life, encourage his spouse to sleep with other Students of Gans Horn's choosing, or demand that SCHNEIDER and Student #1 divorce.

113.    On one occasion during Class, Sharon Gans Horn directed one Student, a married woman, to have sex with another Student after Class. These Students complied.

114.    At one Class that Sharon Gans Horn led, Gans Horn directed the Students to reveal a childhood trauma. At Gans Horn's direction, SCHNEIDER divulged to Gans Horn and all of the Students in attendance that evening that he was sexually abused by a male camp counselor when he was just fourteen years old. Until that evening, SCHNEIDER had never told anyone about the sexual abuse. Upon hearing about the abuse, Gans Horn told SCHNEIDER (and the rest of the Students) that SCHNEIDER had been "experimenting" rather than abused and that he should simply cease thinking about the incident with the counselor. On multiple occasions thereafter, Gans Horn openly questioned whether SCHNEIDER was heterosexual and intentionally left SCHNEIDER with the impression that his childhood sexual abuse was his fault. In this way, Gans Horn obtained sensitive information about SCHNEIDER – another method used by the Organization to ensure SCHNEIDER's continued participation in it – and used shame and humiliation to maintain control over SCHNEIDER.

115.    After two Students, hereinafter "Student #6" and "Student #7," left the Organization, Sharon Gans Horn used collateral she had obtained on these Students to punish them for leaving the Organization. Specifically, Gans Horn told the respective spouses of these two Students that these two Students had an affair with a leader of the Organization and cheated on their spouses. Gans Horn also divulged this information to other Students, including SCHNEIDER.

116.    Upon information and belief, after SCHNEIDER finally left the Organization in January 2013, Sharon Gans Horn (falsely) told other Students that SCHNEIDER was gay and had never once had sexual relations with his wife.

<u>CONTROL OVER PERSONAL DECISIONS</u>

117.    The Organization and the Inner Circle maintained control over the most personal and intimate details of the lives of the Students, including SCHNEIDER. Maintaining this control was yet another means the Organization used to ensure that the Students would adhere to its rules, including by providing the labor and services set forth below.

118.    SCHNEIDER witnessed an incident where Sharon Gans Horn told another Student that she should divorce her spouse after the spouse left the Organization. When the Student refused to do so, Gans Horn told her that she could no longer be affiliated with the Organization. Thereafter, the other Students stopped associating with that Student and the Student's primary business client, who was another Student at the School, abruptly terminated their business relationship because the Student did not follow Gans Horn's divorce directive. In so witnessing, SCHNEIDER understood that when Students did not follow Gans Horn's directives – including over personal decisions – they risked Gans Horn terminating the Student's affiliation with the Organization and the ostracization and economic losses that would necessarily follow.

119.    In the mid to late-1990s, at the suggestion of the Organization, SCHNEIDER decided that he wanted a serious relationship and to begin a family. With Sharon Gans Horn's approval, he began to date – and got engaged to – another Student, but broke off the relationship after Gans Horn told him that she did not believe the relationship would work and directed him to end it. Shortly thereafter, SCHNEIDER began to date Student #1, again with Gans Horn's approval and, within a few months, they married. (SCHNEIDER later learned that Gans Horn had orchestrated SCHNEIDER's relationship with Student #1). When Gans Horn learned that SCHNEIDER and Student #1 wanted to get pregnant, Gans Horn called SCHNEIDER and

strongly suggested to SCHNEIDER that Student #1 was too old to have a healthy child and instead told him to have a child with Student #1's 19-year-old daughter (i.e., SCHNEIDER's step-daughter). SCHNEIDER rejected the idea and, fortunately, Gans Horn did not further pursue the matter.

120.     In or about 2010, when Sharon Gans Horn learned that SCHNEIDER and Student #1 were separating, Gans Horn told SCHNEIDER that he should let Student #1 have custody of their child. (Contrary to the direction of Gans Horn, and at the advice and assistance of his matrimonial lawyer, SCHNEIDER ultimately obtained joint custody of the child.)

<u>OSTRACIZING</u>

121.     As described above, when Students left the School, the Organization and the Inner Circle made clear to the Students, including SCHNEIDER, that they could not have any contact with other Students.

<u>INTOLERANCE</u>

122.     During one Class, SCHNEIDER expressed his displeasure with the defendant LORRAINE IMLAY'S public humiliation and personal attacks upon a Student, hereinafter Student #8, and said that he was in Student #8's "corner." At the following Class, IMLAY began the evening by demanding that SCHNEIDER stand and verbally abused him for expressing his dissent at the prior Class. IMLAY claimed that it was she who was in Student #8's "corner," and that SCHNEIDER's comments were "harmful" to the Class and Student #8.

<u>ISOLATION</u>

123.     On more than one occasion during Class, Sharon Gans Horn and the Inner Circle, including the defendants LORRAINE IMLAY, MINERVA TAYLOR and GREGORY KOCH, publicly discouraged SCHNEIDER from having contact with his widowed mother, his brother

and his old friends, saying that they were bad influences on SCHNEIDER and threatening that if he did not limit his contact with them, he would suffer negative consequences personally and in School. On one occasion, Sharon Gans Horn and TAYLOR told SCHNEIDER that he should not propose marriage to a woman who was not in School.

III.    Labor and Services Performed by SPENCER LEE SCHNEIDER

124.    By deliberately using the coercive and manipulative tactics described above, the Organization and the Inner Circle were able to slowly and progressively obtain and maintain control over SCHNEIDER and cause SCHNEIDER to perform extensive labor and services, almost all of which was for the benefit of, and financially enriched, Sharon Gans Horn, the Organization and the Inner Circle.

125.    To induce SCHNEIDER to perform extensive labor and services, the Organization and the Inner Circle told SCHNEIDER that (a) performing the labor and services was an honor and beneficial for his "evolution," i.e., his ability to achieve a higher success in life, (b) SCHNEIDER owed the Organization and the Inner Circle for everything they had done for him (i.e., the "Third Line of Work"), (c) that it was a condition to continue as a Student at the School, and (d) that failure to perform such labor and services would result in expulsion from the School.

126.    Over the course of decades, SCHNEIDER performed the labor and services – not only without compensation but with his paying more than $100,000 to the Organization and Inner Circle – because he believed, as the Organization and the Inner Circle clearly intended, that if he did not perform that labor and services and make payments, he would lose the "power of the work," would be ostracized from the Organization and the Students, which by then had become his entire life, and would endure psychological, financial, and reputational harm and

31

other harm. In addition, among the reasons that SCHNEIDER continued as a Student at the Organization and performed the labor and services at the direction of the Organization was SCHNEIDER's fear that if he left the School, the Organization (i) would ensure that Student #1 would not let SCHNEIDER have contact with his child, (ii) would ensure that his largest client (Student #2) would terminate their business relationship and SCHNEIDER would lose his principal source of income, and (iii) would publicly denigrate SCHNEIDER's reputation and disseminate private and sensitive information that it has obtained from SCHNEIDER, including that he had been sexually abused when he was 14 years old.

127.    In sum, SCHNEIDER performed such labor and services because he feared that if he did not, the Organization and the Inner Circle would (a) publicly reprimand him, leaving him humiliated; (b) tell him to he could no longer serve as one of the Students and the other Students would not be permitted to have any communication with him, leaving him rudderless, virtually wholly alone, without his support network, and without his largest client (Student #2) (which would cause him a significant financial strain), (c) the Organization might disseminate the sensitive information that he had shared with it over the years, including that he was sexually abused as a child, and (d) ensure that he lost contact with the child he shared with Student #1, which collectively and in isolation amounted to serious harm as defined in 18 U.S.C. § 1589(c)(2).

128.    Accordingly, as a result of the scheme, pattern and plan by the Organization and the Inner Circle to use coercive and manipulative tactics, the Students, including SCHNEIDER, closely adhered to the rules prescribed by the Organization and the Inner Circle, slowly grew extremely dependent on the Organization, and performed the following labor and services, all at the direction of the Organization and the Inner Circle.

129.    The defendants LORRAINE TAYLOR, MINERVA TAYLOR and GREGORY KOCH knew, should have known or recklessly disregarded that SCHNEIDER performed the labor and services described below and that he did so on account of the intentional scheme to use a pattern, plan and scheme of manipulative and coercive tactics to make SCHNEIDER believe that if he did not perform the labor and services, he would be subjected to serious harm, including as described above.

<u>ATTENDANCE AT SEMI-WEEKLY CLASSES</u>

130.    At the direction of the Organization and the Inner Circle, SCHNEIDER attended Class as a Student. For nearly 23 years, he participated in Class twice a week, for several hours each night.

131.    To ensure that he continued to attend and participate in Class, the Organization and the Inner Circle, including the defendants LORRAINE IMLAY and MINERVA TAYLOR, regularly castigated and pressured SCHNEIDER to attend and participate.

132.    SCHNEIDER's attendance and participation at Class amounted to labor and services insofar as (i) at the direction of the Organization and the Inner Circle, during Class, SCHNEIDER rendered career advice to the Students, fulfilling the Organization's directive to provide the "Second Line of Work," (ii) SCHNEIDER's attendance at Class otherwise perpetuated the means, methods and objectives of the Organization, and (iii) before Class, SCHNEIDER helped to set up the room where Class was held and cleaned up the room after Class concluded.

133.    SCHNEIDER was so afraid that he would be publicly chastised if he missed even a single Class that he showed up no matter how sick he was. One time SCHNEIDER attended

Class despite severe abdominal pain. When Class was over, SCHNEIDER went directly to the emergency room, where he had immediate surgery to remove his gallbladder.

134.    SCHNEIDER attended his last Class at the School in or about early January 2013. As he had for all prior Classes, SCHNEIDER and other Students set up the room where Class was held and cleaned up the room after Class ended.

135.    On one occasion – January 10, 2013 – after SCHNEIDER had missed Class on or about his birthday (the day before), a leader of the Organization left him a voicemail advising him that Sharon Gans Horn told her to tell SCHNEIDER that it was "unacceptable" that SCHNEIDER had missed Class and that he should consider leaving School, i.e., the Organization. When SCHNEIDER suggested he might do just that, the leader later told SCHNEIDER, in substance, "Sharon said that you should come to Class on Tuesday and talk about it in front of your friends. This is not something to think about on your own."

136.    SCHNEIDER did not receive any compensation for his labor and services in attending Classes as described in paragraph 132.

137.    The defendants LORRAINE IMLAY, MINERVA TAYLOR and GREGORY KOCH all knew, should have known or recklessly disregarded that SCHNEIDER performed labor and services in the form of attending and participating in Class, as described in paragraph 132, and the coercive and manipulative circumstances under which he did so.

<u>COOKING</u>

138.    At the direction of the Organization and members of the Inner Circle, including the defendant MINERVA TAYLOR, for several years, SCHNEIDER was one of several Students who prepared gourmet meals for the upcoming week for Sharon Gans Horn and delivered the meals to the Organization at the first Class of the week. The defendants

LORRAINE IMLAY and MINERVA TAYLOR oversaw the preparation of meals for Gans

Horn, including by coordinating the Students who would prepare the meals and advising the

Students of the menu for the week's meals.

139.    Upon information and belief, the Organization then had the meals delivered to

Gans Horn at her residence.

140.    SCHNEIDER was never compensated for the meals he prepared and rarely

reimbursed for the food he purchased to be used in the preparation of the meals.

141.    The defendants LORRAINE IMLAY, MINERVA TAYLOR and GREGORY

KOCH all knew, should have known or recklessly disregarded that SCHNEIDER performed

labor and services in the form of cooking for Sharon Gans Horn and the coercive and

manipulative circumstances under which he did so.

PHYSICAL LABOR

142.    At various times between 1989 and 2012, at the direction of the Organization and

the Inner Circle, SCHNEIDER performed labor and services, including demolition of walls,

erecting new walls, painting walls and other similar projects, at the facilities where the

Organization held Class. He did not receive any compensation for such labor. For approximately

two months in or about 2004, at the direction of the Organization and the Inner Circle,

SCHNEIDER and other Students renovated the facility where the Organization held Classes in

Manhattan. During that time, SCHNEIDER spent approximately 20 hours per week performing

those renovations. He did not receive any compensation for such labor. SCHNEIDER often

performed this labor late at night and in the early morning hours and the conditions under which

he performed the labor were often unsafe.

143.    In the 2000s, at the direction (and discretion) of the Organization and the Inner Circle, SCHNEIDER and other Students performed renovations at the homes of other Students. He did not receive any compensation for such labor.

144.    In the early 2000s, at the direction of the Organization and the Inner Circle, SCHNEIDER traveled to a compound used by the Organization in Pawling, New York, approximately once or twice per month. At the compound, SCHNEIDER performed heavy-duty construction projects, including building a large outdoor porch and chain-sawing trees. He also performed gardening and cooking at the compound. SCHNEIDER often performed this labor at night and in the early morning hours and in freezing temperatures. SCHNEIDER did not receive any compensation for such labor. The conditions under which SCHNEIDER and others Students performed the construction projects were often unsafe and resulted in injuries to the Students.

145.    In or about and between 1993 and 2000 and 2008 and 2012, at the direction of the Organization and the Inner Circle, SCHNEIDER traveled to a ranch in Montana on an annual basis for a "retreat" lasting approximately ten days. The beneficial owner of the ranch was Sharon Gans Horn. At the ranch in Montana, at the direction of the Organization and the Inner Circle, for almost every day of the "retreat," SCHNEIDER and other Students performed labor-intensive construction projects at the ranch and other labor and services, beginning at approximately 7:00 a.m. and continuing until approximately 9:00 p.m., with a short break for breakfast and a break for a meeting, a rest period and lunch.

146.    For example, and without limitation, on one such "retreat," SCHNEIDER stripped logs to be used to build a large log-cabin structure on the Montana property; on another "retreat," he painted the logs; on other "retreats," he repaired the fence along the perimeter of the ranch, dug ditches, and split logs. On other "retreats," SCHNEIDER mowed the lawn, cleaned cars,

collected garbage, cooked and cleaned. On the "retreat" SCHNEIDER attended in 2012, he painted several cabins located on the property. The Students were afforded one rest day. SCHNEIDER did not receive any compensation for such labor. The conditions under which SCHNEIDER and other Students performed the construction projects at the Montana ranch were often unsafe and resulted in injuries to the Students. Had SCHNEIDER not left the Organization, SCHNEIDER believed that he would have attended the "retreat" in the summer of 2013 (and thereafter) and would have continued to perform physical labor and provide other services without compensation at the Montana ranch.

147.    On one occasion while SCHNEIDER was stripping the logs at the Montana ranch, he began to resent that he was doing this labor and verbally told others that he believed that Sharon Gans Horn should have hired someone to perform the labor. When he did so, Gans Horn broke into hearty laughter and the Inner Circle and other Students joined. Gans Horn then stared at SCHNEIDER with laser focus – in a manner that SCHNEIDER found intimidating – and said, in substance, "Working hard is a privilege, it's for you, to help you grow internally. I could easily hire someone to do this work, but what good would that do you? School is an artificial cosmos." Continuing, she said, in substance, "It's not our fault if negative thoughts come into our head, but it is our fault if we choose to think them. We have a choice to select other thoughts and not think those thoughts. These negative thoughts are just like little birds in your head—just let them come in one ear and out the other." SCHNEIDER clearly understood – as he did when he performed the other labor and services described herein – that if he did not perform the physical labor of stripping the logs, Gans Horn, together with the Inner Circle, would publicly berate him and threaten to ostracize, and ostracize, him from the Organization.

148.    The defendants LORRAINE IMLAY, MINERVA TAYLOR and GREGORY KOCH all knew, should have known or recklessly disregarded that SCHNEIDER performed labor and services in the form of physical labor and the coercive and manipulative circumstances under which he did so. Specifically, IMLAY, TAYLOR and KOCH rarely if ever participated in the physical labor, but they were present while SCHNEIDER and others performed the labor, including at the "retreats" in Montana, at the compound in Pawling, New York and in New York, New York.

## CARETAKING FOR ALEX HORN

149.    In or about and between June 2007 and September 2007, at the direction of the Organization and the Inner Circle, SCHNEIDER regularly served as a caretaker for Alex Horn and Sharon Gans Horn, while Alex Horn was dying of lung cancer. For multiple days in a row, SCHNEIDER slept at the homes of Alex Horn and Gans Horn in New York, New York; Condon, Montana, and Kalispell Montana, and cared for Alex Horn who was bed-ridden. During those periods, SCHNEIDER cooked meals for Alex Horn and Sharon Gans Horn, drove Alex Horn to chemotherapy treatments, shopped for Alex Horn and Sharon Gans Horn, bathed Alex Horn, gave Alex Horn medicine, cleaned their homes, took Alex Horn to the bathroom and changed his diaper, coordinated with a visiting nurse, and picked up prescription medicine for Alex Horn. SCHNEIDER attended Alex Horn's funeral in East Hampton, New York and afterwards performed labor and services for Sharon Gans Horn and the Inner Circle at a home nominally owned by defendant MINERVA TAYLOR, including cleaning the home.

150.    The defendants LORRAINE IMLAY, MINERVA TAYLOR and GREGORY KOCH all knew that SCHNEIDER performed labor and services in the form of caretaking services for Alex Horn and Sharon Gans Horn and the coercive and manipulative circumstances

38

under which he did so. The defendant GREGORY KOCH, in particular, instructed SCHNEIDER on how to cook for and bathe Alex Horn, directing SCHNEIDER to clean Alex Horns "anus" by hand, explaining that doing so was "really a beautiful thing." In connection with caretaking Alex Horn, and on other occasions, defendant KOCH would lose his temper with SCHNEIDER, sometimes publicly, for allegedly not following his directives, causing SCHNEIDER humiliation and shame.

CHAUFFER SERVICES

151.    In or about and between 1999 and 2012, at the direction of the Organization and the Inner Circle, SCHNEIDER regularly served as a chauffer for Sharon Gans Horn, driving her from her residence to the facility where Class was held and then driving her back to her residence. He did not receive any compensation for his chauffeur services.

152.    SCHNEIDER also performed chauffeur services for Gans Horn during the time he spent in Montana.

153.    The defendants LORRAINE IMLAY, MINERVA TAYLOR and GREGORY KOCH all knew, should have known or recklessly disregarded that SCHNEIDER performed labor and services in the form of chauffer services for Sharon Gans Horn and the coercive and manipulative circumstances under which he did so.

RECRUITMENT

154.    Between 1990 and 2010, at the direction of the Organization and the Inner Circle, SCHNEIDER actively recruited prospective students of the Organization.

155.    The defendants MINERVA TAYLOR and LORRAINE IMLAY oversaw the recruitment by Students, including Schneider. When SCHNEIDER expressed his reluctance to

recruit, which he did often, members of the Inner Circle, including Sharon Gans Horn,

TAYLOR, IMLAY, and others, verbally reprimanded him.

156.    Because the recruitment process was rigorous and lengthy, SCHNEIDER devoted

hundreds of hours over the course of years to it.

157.    SCHNEIDER did not receive any compensation for his recruitment services.

158.    The defendants LORRAINE IMLAY, MINERVA TAYLOR and GREGORY

KOCH all knew, should have known or recklessly disregarded that SCHNEIDER performed

labor and services in the form of recruitment for the Organization and the coercive and

manipulative circumstances under which he did so.

<u>PREPARATION FOR CHRISTMAS CLASS</u>

159.    Each year, the Organization and members of the Inner Circle, including the

defendants LORRAINE IMLAY and MINERVA TAYLOR, instructed the Students, including

SCHNEIDER, to prepare an annual Christmas Class. For many years, including several years

between 2000 and 2012, the Students, including SCHNEIDER and at the instruction of the

Organization and members of the Inner Circle, including the defendants LORRAINE IMLAY

and MINERVA TAYLOR, prepared elaborate events that required hundreds of hours of labor

and services on the part of the Students.

160.    As preparation, the Students were divided into committees that met for several

hours after Class, into the early morning, sometimes until 4:00 a.m. (and also for full days on the

weekends) to prepare. The committees designed, constructed, and installed elaborate

decorations; cooked, and taste-tested food; rehearsed scenes from plays; rehearsed dance pieces;

worked on set lists for DJ'd music; and formed a choir to sing Christmas songs. Of course, the

Students were not permitted to tell individuals outside of the Organization of what they were doing during those periods of time.

161.    At the Christmas Class itself, Sharon Gans Horn and the Inner Circle sat at the head table. The Students served as waiters, waitresses, and cleaning staff during the event.

162.    The Organization's 2012 annual Christmas Class was held on or about December 11, 2012 at an offsite location in Manhattan. As he had in past years, SCHNEIDER arrived early on the day of the Class to set up, including by physically constructing an entrance ramp, and stayed late until the next morning cleaning up and transporting materials to the Organization's headquarters in Manhattan. During the event, SCHNEIDER acted as a DJ.

163.    SCHNEIDER did not receive any compensation for his labor and services in connection with the Organization's annual Christmas Class.

164.    The defendants LORRAINE IMLAY, MINERVA TAYLOR and GREGORY KOCH all knew, should have known or recklessly disregarded that SCHNEIDER performed labor and services in the form of preparation for the annual Christmas Class and during the annual Christmas Class and the coercive and manipulative circumstances under which he did so.

IV.    SCHNEIDER's Escape

165.    In or about late 2012, SCHNEIDER finally started to become disillusioned with the School and the Organization.

166.    In or about early January 2013, SCHNEIDER broke the cardinal rule of the Organization and told another individual about the existence of the School, the Organization and some of its methods.

167.    SCHNEIDER attended his last Class in or about early January 2013. As mentioned above, on or about January 10, 2013, a leader of the Organization left SCHNEIDER a

voicemail advising him that Sharon Gans Horn told her to tell SCHNEIDER that it was

"unacceptable" that SCHNEIDER had missed Class the night before and that he should consider

leaving School, i.e., the Organization. As a result of a combination of circumstances, including

(i) SCHNEIDER's divorce from Student #1, (ii) the refusal of Sharon Gans Horn to assist in

resolving a brewing and ongoing conflict with Student #2, (iii) his disclosure of the School to

another individual (and that individual's negative reaction to the Organization upon hearing

about it), and (iv) the public berating of Student #4, SCHNEIDER was for the first time open to

the idea of ending his affiliation with the School and in fact told the leader that he would not be

returning to School.

168.    When SCHNEIDER first attended Class in 1989, he did not have access to the

Internet or search engines that could have potentially revealed derogatory information about

Sharon Gans Horn, Alex Horn, the School and the Organization, including Gans Horn and Alex

Horn's roles in the predecessor organization in San Francisco, California. The day after

SCHNEIDER attended his first Class in 1989, SCHNEIDER did search a legal database for

information about the purported philosopher Gurdjieff, but did not find any derogatory

information during that search.

169.    After SCHNEIDER started to attend more Classes, SCHNEIDER internalized and

strictly adhered to the rules of the School that precluded Students from questioning the

Organization, the School, the Teachers or their methods and understood that those rules similarly

precluded SCHNEIDER from searching for derogatory information about the Organization, the

School, the Teachers or their methods using the Internet and search engines once they became

accessible. Sharon Gans Horn once publicly attacked a student who had used the Internet and

described the material thereon as "lies and poisonous." In fact, the indoctrination methods used

by the Organization and the Inner Circle were so effective that when SCHNEIDER did once

conduct an Internet search – in 2002 and in violation of Gans Horn's previous directive -

SCHNEIDER considered the derogatory information he read to be "lies and poisonous."

170.    When SCHNEIDER left the School and the Organization, the other Students

ceased having contact with him and his primary business client, another Student, i.e., Student #2,

immediately terminated his business relationship with SCHNEIDER and failed to pay

SCHNEIDER for completed legal services. Student #2 also had SCHNEIDER removed from the

board of directors of a public company Student #2 controlled. As a result of SCHNEIDER's

leaving the School and the Organization, SCHNEIDER lost most of his social livelihood, lost

virtually his entire income and became suicidal.

171.    Prior to his escape in January 2013, SCHNEIDER was prevented from asserting

the claims he lodges herein.

172.    First, SCHNEIDER could not assert the claims he lodges herein because

SCHNEIDER did not comprehend that he was the object of coercive and manipulative tactics by

Sharon Gans Horn and the Defendants. As a result of those coercive and manipulative tactics, in

isolation and in combination, including having been taught to blindly accept instructions from

the Organization, Gans Horn and the Defendants, and to never question the validity of the means

and methods of the Organization, Gans Horn or the Defendants, SCHNEIDER did not

understand (i) that he had been a member of a cult, and (ii) that the Organization, Gans Horn and

the Defendants had intentionally devised and executed a scheme to deceive and manipulate him

in order to cause SCHNEIDER to perform labor and services that are detailed herein until well

after he left the Organization in January 2013. In fact, it was not until after the January 10, 2013

telephone call with a leader of the Organization (described above) and after SCHNEIDER

distanced himself from the Organization, started to speak with former Students and performed self-reflection that SCHNEIDER finally started to appreciate (i) that he had been a member of a cult, and (ii) that the Organization, Gans Horn and the Defendants had intentionally devised and executed a scheme to deceive and manipulate him in order to cause SCHNEIDER to perform labor and services that are detailed herein.

173.    Second, SCHNEIDER could not assert the claims he lodges herein because extraordinary circumstances beyond his control made it impossible to file the claims prior to then, i.e., his substantial and well-grounded fear that if he did so, he would endure serious harm (i.e., the same serious harm that caused him to perform the labor and services and is detailed herein). Indeed, the first tenet of the Organization was that SCHNEIDER could not disclose to anyone the existence of the School. SCHNEIDER was also aware that when another Student left the Organization, some members of the Inner Circle had threatened to "kill for Sharon" and his knowledge of that horrific threat also contributed to his fear that serious harm would come to him should he choose a similar path and leave the Organization and disclose the existence of School. Even after SCHNEIDER disclosed the existence of the School to another individual (as described above), SCHNEIDER still believed that he would endure serious harm (i.e., the same serious harm that caused him to perform the labor and services and is detailed herein) if the Organization, Gans Horn and the Defendants learned of his transgression. Accordingly, until at least January 10, 2013, SCHNEIDER harbored a substantial and well-grounded fear that he would endure serious harm if he disclosed in a public court filing the existence of the School and its means and methods as described in detail herein, as would be required for SCHNEIDER to bring the claims he lodges herein. His fear was, in fact, well-grounded because many – albeit

fortunately not all – of the very things he feared would happen if he left the Organization in fact happened after SCHNEIDER escaped.

V.    The Existence of a Conspiracy and the Continuing Course of Conduct

174.    Upon information and belief, Sharon Gans Horn and the defendants LORRAINE IMLAY, MINERVA TAYLOR and GREGORY KOCH, together with other members of the Inner Circle, agreed to commit the forced labor scheme described in detail above.

175.    Upon information and belief, Sharon Gans Horn and the defendants LORRAINE IMLAY, MINERVA TAYLOR and GREGORY KOCH together relocated to New York to begin the School after the media outlets in California disclosed the existence of the predecessor organization in San Francisco and the abuse perpetuated by that organization in 1978.

176.    Upon information and belief, Sharon Gans Horn and the defendants LORRAINE IMLAY, MINERVA TAYLOR and GREGORY KOCH, together with other members of the Inner Circle, regularly met to discuss the objectives of the Organization, the methods used by the Organization, including the manipulative and coercive techniques described herein, and the scheme to obtain the labor and services described herein.

177.    SCHNEIDER overheard members of the Inner Circle planning for hours at a time upcoming Classes, "retreats" and Christmas Classes and discussing confidential information shared by Students.

178.    SCHNEIDER overheard certain members of the Inner Circle strategizing about how to manipulate and control Students during meetings held shortly before Class commenced and on the telephone. On one occasion, SCHNEIDER overheard the Teachers discuss a Student, hereinafter Student #9, who had disclosed to the Students and Teachers at the School that her husband was struggling with alcoholism. The Teachers discussed how they would respond to

Student #9 when she raised the subject of her husband's alcoholism and agreed that they would use shame and humiliation to control Student #9. On one occasion, SCHNEIDER overheard one member of the Inner Circle speaking with the defendant LORRAINE IMLAY about another Student, hereinafter Student #10, who was wealthy, about her marital problems. They discussed how they would respond to Student #10 when she raised the subject of her marital problems and agreed that they would use shame and humiliation to pressure Student #10 to obtain a divorce. On another occasion, SCHNEIDER overheard the same member of the Inner Circle speaking the with defendant LORRAINE IMLAY about another Student, hereinafter Student #11, about his financial problems and unwillingness to devote time to Christmas Class preparations. They discussed how they would use shame and humiliation to pressure Student #11 to perform labor.

179.    The agreement by Sharon Gans Horn and the defendants LORRAINE IMLAY, MINERVA TAYLOR and GREGORY KOCH, together with other members of the Inner Circle, to obtain labor and services from SCHNEIDER through the manipulative and coercive techniques described herein continued from approximately 1989 through SCHNEIDER's escape from the School in January 2013.

180.    Upon information and belief, Sharon Gans Horn and the defendants LORRAINE IMLAY, MINERVA TAYLOR and GREGORY KOCH, together with other members of the Inner Circle, agreed to obtain labor and services from Students other than SCHNEIDER through the manipulative and coercive techniques described herein until Gans Horn's death in 2021 and thereafter.

181.    Until SCHNEIDER left the School in January 2013, Sharon Gans Horn and the defendants LORRAINE IMLAY, MINERVA TAYLOR, GREGORY KOCH and OSG, LLC, intended to use the manipulative and coercive techniques described herein to cause

SCHNEIDER to continue providing labor and services and attempted to use the manipulative and coercive techniques described herein to cause SCHNEIDER to continue providing labor and services.

## COUNT ONE
## (VIOLATION OF 18 U.S.C. §§ 1589 and 2)
## (As against all of the Defendants)

182.    SCHNEIDER repeats and realleges the allegations contained above, as if fully set forth herein.

183.    The Defendants knowingly provided or obtained the labor or services of SCHNEIDER by one of, or by any combination of, the following means: (a) by means of serious harm or threats of serious harm to SCHNEIDER or another person; or (b) by means of any scheme, plan, or pattern intended to cause SCHNEIDER to believe that, if SCHNEIDER did not perform such labor or services, SCHNEIDER or another person would suffer serious harm.

184.    The Defendants knowingly benefitted, financially or by receiving anything of value, from participation in a venture which had engaged in the providing or obtaining of labor or services by any of the following means (a) by means of serious harm or threats of serious harm to SCHNEIDER or another person; or (b) by means of any scheme, plan, or pattern intended to cause SCHNEIDER to believe that, if SCHNEIDER did not perform such labor or services, SCHNEIDER or another person would suffer serious harm, knowing or in reckless disregard of the fact that the venture had engaged in the providing or obtaining of labor or services by any of such means.

185.    The Defendants committed the conduct alleged in the preceding two paragraphs or knowingly benefitted, financially or by receiving anything of value from participation in a

venture which the Defendants knew or should have known had engaged in one or more acts described in the preceding two paragraphs.

186.    By reason of the foregoing, the Defendants are liable for economic damages, pain and suffering, punitive damages and attorneys' fees.

## COUNT TWO
## (CONSPIRACY/ATTEMPTED VIOLATION OF 18 U.S.C. §§ 1589 and 2)
### (As against all of the Defendants)

187.    SCHNEIDER repeats and realleges the allegations contained above, as if fully set forth herein.

188.    The Defendants knowingly attempted to, or conspired to, provide or obtain the labor or services of SCHNEIDER by one of, or by any combination of, the following means: (a) by means of serious harm or threats of serious harm to SCHNEIDER or another person; or (b) by means of any scheme, plan, or pattern intended to cause SCHNEIDER to believe that, if SCHNEIDER did not perform such labor or services, SCHNEIDER or another person would suffer serious harm.

189.    The Defendants knowingly attempted to, or conspired to, benefit, financially or by receiving anything of value, from participation in a venture which had engaged and would engage in the providing or obtaining of labor or services by any of the following means (a) by means of serious harm or threats of serious harm to SCHNEIDER or another person; or (b) by means of any scheme, plan, or pattern intended to cause SCHNEIDER to believe that, if SCHNEIDER did not perform such labor or services, SCHNEIDER or another person would suffer serious harm, knowing or in reckless disregard of the fact that the venture had engaged, and would engage, in the providing or obtaining of labor or services by any of such means.

190.    The Defendants committed the conduct alleged in the preceding two paragraphs or knowingly benefitted, financially or by receiving anything of value from participation in a venture which the Defendants knew or should have known had engaged in one or more acts described in the preceding two paragraphs.

191.    By reason of the foregoing, the Defendants are liable for economic damages, pain and suffering, punitive damages and attorneys' fees.

## COUNT THREE
## (VIOLATION OF 18 U.S.C. §§ 1590 and 2)
## (As against all of the Defendants)

192.    SCHNEIDER repeats and realleges the allegations contained above, as if fully set forth herein.

193.    The Defendants knowingly recruited, harbored, transported, provided, or obtained by any means, SCHNEIDER for labor or services, as described in Paragraph 183, in violation of Title 18, United States Code, Sections 1589 and 2.

194.    The Defendants committed the conduct alleged in the preceding paragraph or knowingly benefitted, financially or by receiving anything of value from participation in a venture which the Defendants knew or should have known had engaged in one or more acts described in the preceding paragraph.

195.    By reason of the foregoing, the Defendants are liable for economic damages, pain and suffering, punitive damages and attorneys' fees.

## COUNT FOUR
## (CONSPIRACY/ATTEMPTED VIOLATION OF 18 U.S.C. §§ 1590 and 2)
## (As against all of the Defendants)

196.    SCHNEIDER repeats and realleges the allegations contained above, as if fully set forth herein.

197.    The Defendants knowingly attempted to, or conspired to, recruit, harbor, transport, provide, or obtain by any means, SCHNEIDER for labor or services, as described in Paragraph 183, in violation of Title 18, United States Code, Sections 1589 and 2.

198.    The Defendants committed the conduct alleged in the preceding paragraph or knowingly benefitted, financially or by receiving anything of value from participation in a venture which the Defendants knew or should have known had engaged in one or more acts described in the preceding paragraph.

199.    By reason of the foregoing, the Defendants are liable for economic damages, pain and suffering, punitive damages and attorneys' fees.

[SIGNATURE PAGE FOLLOWS]

**WHEREFORE**, PLAINTIFF requests judgment as follows:

On all counts, awarding damages in favor of the plaintiff SPENCER LEE SCHNEIDER, in an amount to be determined at trial, plus attorneys' fees.

Granting SCHNEIDER such other and further relief as the Court deems just and proper.

Dated: December 16, 2022
Brooklyn, New York

Respectfully submitted,

By:

Elizabeth A. Geddes (NY Reg. #4348470)
Nadia I. Shihata (NY Reg. #4253886)
Shihata & Geddes LLP
155 Water Street
Brooklyn, New York 11201
(646) 974-1143
liz@shihatageddes.com
nadia@shihatageddes.com
Attorneys for Plaintiff Spencer Lee Schneider

**VERIFICATION**

STATE OF NEW YORK                )

                                                      ) ss.:

COUNTY OF NEW YORK            )

  SPENCER LEE SCHNEIDER, declares under penalty of perjury of the laws of the

United States of America I am the plaintiff in the case captioned Spencer Lee Schneider v. OSG,

LLC, et al., before the United States District Court for the Eastern District of New York and have

authorized the filing of this complaint. I have reviewed the allegations made in the complaint,

and to those allegations of which I have personal knowledge, I believe them to be true. As to

those allegations of which I do not have personal knowledge, I rely on statements made orally

and in writing by other former members and prospective members of OSG, LLC, and its

predecessor entities, incorporated or not, and I believe them to be true.

Dated: December 16, 2022

             _____

             SPENCER LEE SCHNEIDER