UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
                                                       :

**SPENCER LEE SCHNEIDER**,

                           Plaintiff,

                           – against –

**OSG, LLC**, d/b/a Odyssey Study Group,
**LORRAINE IMLAY**, individually and as a
fiduciary of the Estate of Sharon Gans Horn,
**MINERVA TAYLOR**, individually and as a
fiduciary of the Estate of Sharon Gans Horn, and
**GREGORY KOCH**,

                          Defendants.
------------------------------------------------------------------ X

**MEMORANDUM DECISION AND ORDER**

22-CV-7686 (AMD) (VMS)

**ANN M. DONNELLY**, United States District Judge:

For more than 23 years, the plaintiff was a member of the Odyssey Study Group ("OSG"), which he alleges was "a cult" in which the organization and its leaders coerced him into "perform[ing] thousands of hours of unpaid labor and services by instilling in him a fear that if he did not perform such labor and services, he would endure serious harm." (ECF No. 1 ¶ 1.) He alleges violations of forced labor and trafficking laws. The defendants move to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the following reasons, the motion is denied.[1]

---

[1] The Honorable Frederic Block, to whom this case was originally assigned, recused himself on March 4, 2024. (ECF No. 44.) The case was reassigned to this Court the same day. (*ECF Order dated Mar. 4, 2024.*)

**BACKGROUND**

The following facts are drawn from the complaint and assumed to be true, with all reasonable interferences drawn in the plaintiff's favor. *See Peretti v. Authentic Brands Group LLC*, 33 F.4th 131, 137 (2d Cir. 2022).

**I.     The Odyssey Study Group**

Sharon Gans Horn and her husband, Alex Horn, founded the Odyssey Study Group ("OSG") in about 1980. (ECF No. 1 ¶¶ 12, 13.) Gans Horn was OSG's head "teacher" until her death in 2021. (*Id.* ¶ 16.) She led the organization with an "inner circle" of trusted "lieutenants," including defendants Lorraine Imlay, Minerva Taylor, and Gregory Koch. (*Id.* ¶ 17.)

OSG "operated in secret" as an "esoteric school" that promoted the teachings of a "philosopher" named George Gurdjieff and one of his students, Peter Ouspensky, "purport[ing] to provide [OSG] 'students' . . . tools to enrich the Students' lives, [and] to improve the Students' psychological well-being and to achieve overall success." (*Id.* ¶¶ 12, 58.) OSG focused its student recruitment efforts on young professionals who were unhappy or dissatisfied with their lives and "searching for answers, meaning[,] and help." (*Id.* ¶ 44.) OSG students paid tuition and attended semi-weekly classes and "numerous other activities and 'retreats.'" (*Id.* ¶ 23.) Some of the charges included:

- $300 to $400 monthly tuition for class,
- $1200 tuition for annual retreat,
- $100 annual fee for Gans Horn's retirement fund,
- $10 weekly towards an "orphanage fund,"
- a $50 monthly maintenance fee for rent and other expenses of the facilities in which classes were held,
- $1,000 or more annually for "property taxes and upkeep on a ranch in Montana . . . of which Gans Horn was the beneficial owner and sole resident,"
- $200 or more annually for Christmas parties and birthday parties,

2

- $200 annually for Christmas and birthday gifts for Gans Horn and the members of the inner circle, and
- $200 to attend "country retreats" at a "compound" in Pawling, New York.

(*Id.* ¶ 27.) OSG and its leadership derived millions of dollars in revenue from its students' financial contributions. (*Id.* ¶ 28.)

Students were also required to perform free labor for OSG's benefit—"to keep [the organization] functioning and maintained in all respects"—which OSG and its members called the "Third Line of Work." (*Id.* ¶¶ 29–30.)

The defendants expected students to follow a rigid set of rules, including mandated secrecy, complete obedience to Gans Horn's and other teachers' instructions—which covered every aspect of the students' personal lives—and ostracizing anyone who left the organization. (*See id.* ¶¶ 31–41.) The students were also taught that sleep deprivation was beneficial, "that sleep was harmful to their 'evolution,'" and that they "needed no more than a few hours of sleep at night." (*Id.* ¶¶ 97–98.)

Gans Horn "encouraged adultery among students;" for example, she "directed one student, a married woman, to have sex with another student after Class." (*Id.* ¶¶ 112–13.)

If a student broke a rule, "including by failing to adhere to one of Sharon Gans Horn's directives, Gans Horn disclosed personal and sensitive information" about that student to others. (*Id.* ¶ 111.) For example, after two students left OSG, Gans Horn "told the respective spouses of these two Students" that they had "cheated on their spouses." (*Id.* ¶ 115.)

## II. The Plaintiff's Time as a Student

The plaintiff was an OSG student for 23 years. (*Id.* ¶ 68.) Someone invited the plaintiff to join the group in 1989, when the plaintiff was a 29-year-old lawyer in New York City. (*Id.* ¶ 55.) He was mourning the loss of his father "who had died suddenly four years earlier and

contending with a growing sense of loneliness that stemmed from . . . many of his friends mov[ing] away from New York City to start families while he was still single." (*Id.* ¶ 56).

The plaintiff alleges that defendant Minerva Taylor greeted him at his first class and told him that she hoped OSG would be a "rich and wonderful experience" for him, "and then suggested to him that he might meet his 'soulmate' at the School." (*Id.* ¶ 60.) After that class, someone assigned to be the plaintiff's "sustainer" called the plaintiff and enticed him to remain in OSG. (*Id.* ¶¶ 63–64.)

A few weeks after he joined OSG, the plaintiff lost his law firm job and decided to start his own law firm as a solo practitioner. (*Id.* ¶ 66.) OSG's inner circle supported the decision and told the plaintiff that his success depended on his continued participation in OSG. (*Id.*) With OSG's encouragement and approval, another student ("Student #2") became the plaintiff's primary client. (*Id.* ¶ 82.)

During his 23 years in OSG, the plaintiff attended class "twice a week, for several hours each night." (*Id.* ¶ 130.) In 1990, "approximately one year after [the plaintiff] began to attend Classes, Sharon Gans Horn started to make appearances at Classes." (*Id.* ¶ 67.) "At the first Class in which Gans Horn spoke, she discussed seven 'levels of man' and stated that she was 'very close' to the seventh level, which she described as being immortal and equated to 'Christ, Mohammed, Moses and the Buddha,' and that she hoped to reach the seventh level soon." (*Id.*) "In that same Class, Gans Horn told the Students that sex affected their ability to succeed and directed the Students to 'use your sex' to promote the School and the Students' 'evolution,' i.e., achievement of higher success in life." (*Id.*)

During one class, Gans Horn directed students to reveal a childhood trauma. (*Id.* ¶ 114.) The plaintiff told Gans Horn and the other class members that a camp counselor sexually abused

4

him when he was 14 years old.  (*Id.*)  Gans Horn told him that he "had been 'experimenting' rather than abused."  (*Id.*)  Following the plaintiff's revelation, Gans Horn frequently questioned the plaintiff's sexuality and implied that the abuse was his fault.  (*Id.*)

The plaintiff was "so afraid that he would be publicly chastised if he missed even a single Class that he showed up no matter how sick he was."  (*Id.* ¶ 133.)  "One time [the plaintiff] attended Class despite severe abdominal pain.  When Class was over, [he] went directly to the emergency room, where he had immediate surgery to remove his gallbladder."  (*Id.*)

Gans Horn and her inner circle discouraged the plaintiff and other students from maintaining contact with their families, so the plaintiff "distanced himself" from his mother, brother, and old friends.  (*See id.* ¶¶ 75–77, 123.)  He developed close friendships with other OSG students.  (*See id.*)

In the mid to late-1990s, Gans Horn and Taylor told the plaintiff not to propose to his girlfriend, who was not a student of OSG, so he did not.  (*Id.* ¶ 123.)  He dated and eventually got engaged to another OSG student, but "broke off the relationship after Gans Horn told him that she did not believe the relationship would work and directed him to end it."  (*Id.* ¶ 119.)

Shortly thereafter, the plaintiff started dating another student ("Student #1").  (*Id.*)  The plaintiff married her "within a few months," with Gans Horn's encouragement and approval. (*Id.*)  "When Gans Horn learned that [the plaintiff] and Student #1 wanted to get pregnant, Gans Horn called [the plaintiff] and strongly suggested to [him] that Student #1 was too old to have a healthy child and instead told him to have a child with Student #1's 19-year-old daughter (i.e., [the plaintiff's] step-daughter)."  (*Id.*)  The plaintiff "rejected the idea and, fortunately, Gans Horn did not further pursue the matter."  (*Id.*)  The plaintiff and Student #1 had a child together, but eventually decided to separate in 2010.  (*Id.* ¶ 120.)  Gans Horn told the plaintiff that he

5

should let Student #1 have custody of their child. (*Id.*) The plaintiff did not follow her instruction and he and Student #1 share joint custody of the child. (*Id.*)

Consistent with OSG's doctrine, Gans Horn and the inner circle "induce[d]" the plaintiff to perform free labor; they said it was necessary for his "evolution" in life and continued membership in the organization. (*Id.* ¶¶ 124–28.) The labor included recruiting other students, giving students career advice, setting up and cleaning up classrooms, planning and staffing OSG events, and maintaining and renovating the organization's facilities in New York and Montana. (*Id.* ¶¶ 124–28, 142–47, 154–57, 159–163.) The plaintiff also provided free labor to Gans Horn personally; he cooked meals for her, chauffeured her, and took care of her husband after he contracted lung cancer. (*Id.* at ¶¶ 124–28, 138–141, 149–152.) According to the complaint,

> [the plaintiff] performed such labor and services because he feared that if he did not, the Organization and the Inner Circle would (a) publicly reprimand him, leaving him humiliated; (b) tell him to he could no longer serve as one of the Students and the other Students would not be permitted to have any communication with him, leaving him rudderless, virtually wholly alone, without his support network, and without his largest client (Student #2) (which would cause him a significant financial strain); (c) the Organization might disseminate the sensitive information that he had shared with it over the years, including that he was sexually abused as a child; and (d) ensure that he lost contact with the child he shared with Student #1[.]

(*Id.* ¶ 127.)

The plaintiff attended his last class in January 2013. (*Id.* ¶ 134.) A leader called him on January 10, 2013, and told him that missing a class was "unacceptable;" the plaintiff responded that he would not be returning. (*Id.* ¶¶ 135, 167.)

After the plaintiff left OSG, other students cut off contact with him, and Student #2 terminated the client relationship, refused to pay for past legal services, and had the plaintiff removed from the board of a company Student #2 controlled. (*Id.* ¶ 170.)[2]

### III.  Procedural History

The plaintiff brought this lawsuit against OSG, Imlay, Taylor, and Koch on December 16, 2022. (ECF No. 1.) He brings the following claims against the defendants under 18 U.S.C. §§ 1589 and 1590 of the Trafficking Victims Protection Act ("TVPA") for (1) knowingly obtaining the plaintiff's labor by means of harm or serious threats of harm; (2) attempting and conspiring to obtain forced labor in violation of the TVPA; (3) knowingly recruiting, harboring, transporting, and providing the plaintiff for labor and services in violation of the TVPA; and (4) attempting and conspiring to traffic the plaintiff in violation of the TVPA. (*Id.*)

The defendants jointly move to dismiss. (ECF No. 32-1.) Judge Block held oral argument on January 12, 2024. (ECF No. 40-1.) The case was reassigned to the undersigned on March 4, 2024. (*ECF Order dated Mar. 4, 2024.*)

## LEGAL STANDARD

To avoid dismissal, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Although "detailed factual allegations" are not required, a complaint that includes only "labels and

---

[2] The complaint suggests that Student #2's termination of their business relationship was not entirely attributable to the plaintiff's decision to leave OSG. Before he left OSG, the plaintiff had "a brewing and ongoing conflict with Student #2." (*Id.* ¶ 167.)

7

conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.  A complaint fails to state a claim "if it tenders naked assertions devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678 (citations and alterations omitted).

## DISCUSSION

### I. TVPA Legal Background

18 U.S.C. § 1589 makes it a crime to obtain forced labor.  18 U.S.C. § 1590 criminalizes trafficking in forced labor, including recruiting, harboring, and transporting someone to provide forced labor.  *See Akhtar v. Vitamin Herbal Homeopathic Ctr. Inc.*, No. 19-CV-1422, 2021 WL 7186030, at *9 (E.D.N.Y. Apr. 30, 2021); *Ricchio v. McLean*, 853 F.3d 553, 556 (1st Cir. 2017); *Martinez v. Calimlim*, 651 F. Supp. 2d 852, 859 (E.D. Wis. 2009).

A victim of either crime "may bring a civil action against [anyone who] knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter."  18 U.S.C. § 1595(a).

"Forced labor" is a term of art under the statute.  The plaintiff relies on § 1589(a)(4)— labor obtained "by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm."  *Id.* § 1589(a)(4).  Serious harm is "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm."  *Id.* § 1589(c)(2).

8

## II.     Timeliness

The statute of limitations for a civil action under § 1595 is ten years. *See* 18 U.S.C. § 1595(c)(1). The plaintiff filed his complaint in December 2022. (ECF No. 1.) Courts have held that the statute involves a continuing tort, and that a single act occurring within the limitations period will preserve a claim based on all acts that were part of a single pattern. *See, e.g.*, *Sahebdin v. Khelawan*, No. 21-CV-2956, 2022 WL 4451005, at *4 (E.D.N.Y. Sept. 24, 2022); *Ali v. Khan*, 336 F. Supp. 3d 901, 910 (N.D. Ill. 2018); *Headley v. Church of Scientology Int'l*, No. 09-CV-3987, 2009 WL 10671965, at *6 (C.D. Cal. Aug. 12, 2009). Accordingly, the plaintiff's § 1589 claims are not time-barred.[3]

The plaintiff's § 1590 claims are also timely. The plaintiff alleges that he traveled to "a compound used by the Organization in Pawling, New York, approximately once or twice per month" and to a "ranch in Montana on an annual basis" where he performed "heavy-duty" labor without compensation at OSG's and the inner circle's direction. (ECF No. 1 ¶¶ 144–45.) These allegations are based on the defendants' acts in harboring and transporting the plaintiff, not in recruiting him. *See Ricchio*, 853 F.3d at 556; *Martinez*, 651 F. Supp. 2d at 859. Thus, the § 1590 claims are timely. The defendants' argument to the contrary is premised on the date that OSG recruited the plaintiff, not on their acts in harboring and transporting him.

Moreover, the plaintiff's claims are based on a conspiracy theory. The plaintiff maintains that the conspiracy began when he joined OSG and continued until January 13, 2013, when a conspirator called him by telephone and reprimanded him for missing a class, as part of the

---

[3] The plaintiff also argues that the statute of limitations should be equitably tolled on the theory that OSG's hold over him prevented him from filing suit until he left the organization. Courts have credited similar explanations in finding equitable tolling at the motion to dismiss stage, *see, e.g.*, *Hongxia Wang v. Enlander*, No. 17-CV-4932, 2018 WL 1276854, at *4 (S.D.N.Y. Mar. 6, 2018), so the plaintiff's claims are also timely on this ground.

9

conspiracy. (ECF No. 1 ¶ 135, 167.) Thus, the plaintiff's claims are timely. *See Doe v. Indyke*, 465 F. Supp. 3d 452, 462 (S.D.N.Y. 2020) (finding a TVPA claim based on a conspiracy timely).

### III. Allegations of "Serious Harm" for the Plaintiff's Forced Labor Claim

The defendants argue that the complaint does not allege that any of them ever actually threatened the plaintiff with serious harm, pointing to paragraph 127 of the complaint, which states:

> [The plaintiff] performed such labor and services because he feared that if he did not, the Organization and the Inner Circle would (a) publicly reprimand him, leaving him humiliated; (b) tell him to he could no longer serve as one of the Students and the other Students would not be permitted to have any communication with him, leaving him rudderless, virtually wholly alone, without his support network, and without his largest client (Student #2) (which would cause him a significant financial strain), (c) the Organization might disseminate the sensitive information that he had shared with it over the years, including that he was sexually abused as a child, and (d) ensure that he lost contact with the child he shared with Student #1[.]

(*Id.* ¶ 127.) The plaintiff alleges that the defendants threatened him with serious harm by (a) threatening public humiliation, (b) threatening to ostracize him, leading to the loss of his "support network" and largest client, (c) threatening to disseminate sensitive information, and (d) loss of contact with his child. (*See id.*)

In addition to proscribing obtaining labor through threats, *see* 18 U.S.C. §§ 1589(a)(1) (threats of force or restraint), (a)(2) (threats of serious harm), and (a)(3) (threatened abuse of law or legal process), the TVPA also covers "any scheme, plan, or pattern" intended to create a reasonable belief in the victim that "[he] or another person would suffer serious harm or physical restraint," *id.* § 1589(a)(4).

At this stage of the litigation, the complaint sufficiently alleges that the defendants intended to make the plaintiff believe that he would suffer serious harm if he did not perform labor and services for the organization. For example, the plaintiff alleged that he feared he

10

would lose his largest client, Student #2, whom OSG referred to the plaintiff, if he did not follow the defendants' rules. *See Richardson v. Nw. Univ.*, No. 21-CV-522, 2023 WL 6197447, at *5–6 (N.D. Ill. Sept. 21, 2023) (finding "serious harm" under the TVPA where the plaintiff alleged a "looming financial burden" if she did not perform services for the defendant); *Paguirigan v. Prompt Nursing Emp. Agency LLC*, 286 F. Supp. 3d 430, 438 (E.D.N.Y. 2017) ("Allegations of [] a severe financial burden are more than enough to rise to the level of harm necessary to state a TVPA claim."). Indeed, the plaintiff alleges that Student #2 ended the client relationship when the plaintiff quit OSG.[4]

The plaintiff also alleged that OSG's standard practice was to shame disobedient students and ostracize those who left the organization. The complaint alleges that the plaintiff observed the defendants enforce this practice, providing a reasonable basis for him to conclude that he would face similar consequences. Whether those consequences were serious enough to compel a reasonable person in the plaintiff's circumstances to perform labor cannot be resolved on a motion to dismiss. *See United States v. Law*, 990 F.3d 1058, 1064 (7th Cir. 2021) (rejecting an argument that there was insufficient evidence of serious harm because serious harm is "defined broadly in § 1589" to include "nonphysical" harm that is "sufficiently serious [] to compel a reasonable person [] to perform or to continue performing labor or services," and the there was evidence of "psychological harm" "at minimum").

The plaintiff further maintains that he "lived in fear of physical retaliation," citing the allegation in his complaint that "when another Student left the Organization, some members of

---

[4] The defendants argue that the plaintiff alleges harms that are unrelated to and inconsistent with his decision to leave the organization. The defendants say that the plaintiff has not sufficiently alleged that Student #2 fired the plaintiff because he left OSG, or that Student #1 would keep him from seeing his child if he left OSG. But these issues of causation and motivation cannot be resolved on a motion to dismiss. At this stage of litigation, the plaintiff has alleged enough facts to support he feared those harms, sufficient to survive a motion to dismiss.

11

the Inner Circle had threatened to 'kill for Sharon [Gans Horn].'" (ECF No. 1 ¶ 173.) The plaintiff does not specify which members of the inner circle allegedly made this statement, but, nonetheless, these threats of physical violence are sufficient to show that the plaintiff reasonably feared serious harm. *See Law*, 990 F.3d 1058, 1064.[5]

      The defendants also argue that the plaintiff has not established scienter under 18 U.S.C. § 1589. "Section 1589(a) contains an express scienter requirement ('whoever *knowingly* provides or obtains the labor or services of a person') and one of its subsections, § 1589(a)(4), contains a second scienter requirement ('by means of any scheme, plan, or pattern *intended* to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint')." *Paguirigan*, 286 F. Supp. 3d at 438–39 (cleaned up) (quoting 18 U.S.C. § 1589(a)). "There must be evidence from which the jury could find that the employer *intended* to cause the victim to believe that [he] would suffer serious harm—from the vantage point of the victim—if [he] did not continue to work[.]" *Id.* (cleaned up) (quoting *Muchira v. Al-Rawaf*, 850 F.3d 605, 618 (4th Cir. 2017)). "The linchpin of the serious harm analysis under § 1589 is not just that serious harm was threatened but that the employer intended the victim to believe that such harm would befall [him] if [he]" discontinued his labor. *Id.* In making the scienter determination, the Court must "consider the

---

[5] The defendants also argue that the plaintiff's interpretation of the TVPA violates the First and Fourteenth amendments "[b]ecause Schneider does not allege any actual threats of serious harm used to coerce membership in or labor for OSG, the gravamen of his Complaint, read as a whole, is that Defendants improperly used ideas and speech to recruit members to OSG, to convince them of the benefit of performing the Gurdjieff Work, to shame or humiliate them if they failed to do the Gurdjieff Work or lived up to the teaching's standards, and to instill a fear that they would lose the benefits of the Gurdjieff Work, and the associated community, if they stopped participating and left OSG." (ECF No. 32-1 at 26.) As an initial matter, the plaintiff has plausibly alleged that the OSG obtained labor from him through a scheme intended to create a reasonable belief that he would suffer serious harm. As discussed above, the plaintiff did not simply allege that he feared that the defendants would expel him. Moreover, the plaintiff has alleged that OSG is a "commercial establishment," not a religion. (ECF No. 32-2 at 22.)

12

particular vulnerabilities of a person in the victim's position, though the victim's acquiescence must be *objectively reasonable* under the circumstances." *Id.* (internal quotation marks omitted).

The defendants contend that "OSG's sophisticated members did the Gurdjieff Work because they, for whatever reason, believed it to be beneficial in some way," and not because the defendants threatened them.  (ECF No. 32-1 at 25–26.)  But the Court is bound by the allegations in the complaint.  The plaintiff did not allege that he thought the free labor would be spiritually beneficial.  Rather, he claimed that he feared the repercussions if he did not: public reprimand, ostracization, dissemination of his sensitive information, loss of contact with his child and even physical retaliation.  Thus, the plaintiff has sufficiently alleged that the defendants intended students to fear that they would suffer serious harm if they left the organization or stopped working for the defendants.  *See Paguirigan*, 286 F. Supp. 3d at 439 ("The TVPA does not require that plaintiffs be kept under literal lock and key. . . . Rather, the fundamental purpose of § 1589 is to reach cases of servitude achieved through nonviolent coercion—namely serious harm, the threat of serious harm, or the abuse or threatened abuse of legal process.").[6]

Accordingly, the plaintiff has plausibly alleged serious harm.[7]

---

[6] In addition, the defendants' argument that the § 1590 claim is "frivolous on its face" is meritless. (*See* ECF No. 32-1 at 23–24.)  As noted above, the plaintiff's theory on this claim is not rooted in his initial recruitment; rather, it is rooted in the defendants' acts in harboring and transporting the plaintiff in violation of the TVPA.

[7] For these same reasons, the plaintiff has also stated a conspiracy claim, as he has alleged sufficient facts to support that the defendants "entered into a joint enterprise with consciousness of its general nature and extent." *Paguirigan*, 286 F. Supp. 3d at 440.  The plaintiff alleges that the defendants agreed to provide or obtain labor by means of a scheme, pattern or plan intended to cause him to believe that if he did not continue his labor, he would suffer serious harm.  He has thus stated a claim for conspiracy to violate forced labor laws.  *See id.*  He also alleges that the defendants agreed to transport and harbor him for labor and services.  He has thus also stated a claim for conspiracy to violate trafficking laws.  *See id.*

## CONCLUSION

For these reasons, the defendants' motion to dismiss is denied.

**SO ORDERED.**

s/Ann M. Donnelly

ANN M. DONNELLY
United States District Judge

Dated: Brooklyn, New York
       March 27, 2024

14